## IN THE UNITED STATES DISTRICT COURT
## FOR THE EATERN DISTRICT OF WISCONSIN

ELAINE BONIN, individually and on
behalf of all others similarly situated,

    Plaintiff,

    v.          Civil Action No. 2:16-cv-00674-CNC

CBS RADIO, INC.,

    Defendant.

## UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF THE CONSTITUTIONALITY OF THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 3

ARGUMENT ............................................................................................................. 6

I.     THE COURT SHOULD RESOLVE ALL NON-CONSTITUTIONAL
ARGUMENTS PRIOR TO ADDRESSING THE CONSTITUTIONALITY OF
THE TCPA............................................................................................................ 6

II.    MANY OF CBS'S ARGUMENTS CONCERN ISSUES THAT SHOULD NOT,
AND INDEED CANNOT, BE DECIDED IN THIS CASE. ............................................ 7

III.   THE TCPA IS A VALID, CONTENT-NEUTRAL RESTRICTION. ............................ 11

      A.    Courts have long held that the TCPA is consistent with the First
Amendment, and nothing in *Reed* compels a different conclusion. ..................... 11

      B.    As applied to the speech at issue in this case, the TCPA is a valid
restriction on commercial speech........................................................................ 19

IV.   THE TCPA SATISFIES STRICT SCRUTINY. ........................................................ 22

CONCLUSION......................................................................................................... 29

Case 2:16-cv-00674-LA   Filed 02/27/17   Page 2 of 39   Document 40

**CASES**

*Abbas v. Selling Source, LLC*,
 No. 09-cv-3413, 2009 WL 4884471 (N.D. Ill. Dec. 14, 2009)................................................. 12

*Balschmiter v. TD Auto Fin. LLC*,
 303 F.R.D. 508 (E.D. Wis. 2014).......................................................................................... 10

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
 492 U.S. 469 (1989) ............................................................................................................ 20

*Brickman v. Facebook, Inc.*,
 No. 16-cv-00751, 2017 WL 386238 (N.D. Cal. Jan. 27, 2017) ................................ 2, 8, 23, 29

*Brown v. City of Pittsburgh*,
 586 F.3d 263 (3d Cir. 2009)................................................................................................. 27

*Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*,
 149 F.3d 1119 (10th Cir. 1998)............................................................................................. 7

*Cahaly v. Larosa*,
 796 F.3d 399 (4th Cir. 2015)........................................................................................... 18, 25

*Campbell-Ewald Co. v. Gomez*,
 136 S. Ct. 663 (2016) ......................................................................................................... 16

*Carey v. Brown*,
 447 U.S. 455 (1980) ................................................................................................ 13, 17, 25

*CE Design, Ltd. v. Prism Business Media, Inc.*,
 606 F.3d 443 (7th Cir. 2010)............................................................................................. 9, 10

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
 447 U.S. 557 (1980) ............................................................................................................ 19

*Chiropractors United for Research & Educ., LLC v. Conway*,
 No. 3:15-CV-00556-GNS, 2015 WL 5822721 (W.D. Ky. Oct. 1, 2015) ............................... 20

*Citizens for Free Speech, LLC v. Cty. of Alameda*,
 114 F. Supp. 3d 952 (N.D. Cal. 2015) .................................................................................. 18

*City of L.A. v. Alameda Books, Inc.*,
    535 U.S. 425 (2002) ............................................................................................ 18

*City of Peoria v. Gen. Elec Cablevision Corp.*,
    690 F.2d 116 (7th Cir. 1982) ............................................................................ 10

*Contest Promotions, LLC v. City & Cnty. of San Francisco*,
    No. 15-CV-00093-SI, 2015 WL 4571564 (N.D. Cal. July 28, 2015) .................... 20

*Dalton v. United States*,
    816 F.2d 971 (4th Cir. 1987) .............................................................................. 9

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) ............................................................................................ 17

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ............................................................................ 20

*Frisby v. Schultz*,
    487 U.S. 474 (1988) ............................................................................................ 25

*Gomez v. Campbell-Ewald Co.*,
    768 F.3d 871 (9th Cir. 2014) ............................................................ 2, 3, 11,14

*Gresham v. Rutledge*,
    No. 4:16-cv-00241, 2016 WL 4027901 (E.D. Ark. July 27, 2016) ...................... 25

*Gulf Oil Co. v. Bernard*,
    452 U.S. 89 (1981) .............................................................................................. 6

*Hagans v. Lavine*,
    415 U.S. 528 (1974) ........................................................................................ 1, 6

*Hill v. Colorado*,
    530 U.S. 703 (2000) ...................................................................................... 15, 17

*Hynes v. Mayor and Council of Borough of Oradell*,
    425 U.S. 610 (1976) ............................................................................................ 15

*INS v. Chadha*,
    462 U.S. 919 (1983) ............................................................................................ 7

*Joffe v. Acacia Mortg. Corp.*,
    121 P.3d 831 (Ariz. Ct. App. 2005) .................................................................... 3

iii

*Jordan v. Jewel Food Stores, Inc.*,
  743 F.3d 509 (7th Cir. 2014) ............................................................................... 20, 21

*Klein v. City of Laguna Beach*,
  533 F. App'x 772 (9th Cir. 2013) ........................................................................ 15

*Kleiner v. First Nat'l Bank of Atlanta*,
  751 F.2d 1193 (11th Cir. 1985) ............................................................................ 21

*L.A. Police Dep't v. United Reporting Pub. Corp.*,
  528 U.S. 32 (1999) .............................................................................................. 22

*Lehman v. City of Shaker Heights*,
  418 U.S. 298 (1974) ............................................................................................ 17

*Lozano v. Twentieth Century Fox Film Corp.*,
  702 F. Supp. 2d 999 (N.D. Ill. 2010) .................................................................. 4

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ............................................................................................ 25

*Mais v. Gulf Coast Collection Bureau, Inc.*,
  768 F.3d 1110 (11th Cir. 2014) ........................................................................... 10

*Maryland v. Universal Elections, Inc.*,
  729 F.3d 370 (4th Cir. 2013) .............................................................................. 12

*Members of City Council v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ............................................................................................ 22

*Mims v. Arrow Fin. Servs., LLC*,
  565 U.S. 368 (2012) ............................................................................................ 3

*Moser v. FCC*,
  46 F.3d 970 (9th Cir. 1995) .................................................................... 11, 14, 22

*Nat'l Coal. of Prayer, Inc. v. Carter*,
  455 F.3d 783 (7th Cir. 2006) .............................................................................. 25

*New York Tel. Co. v. New York Dep't of Labor*,
  440 U.S. 519 (1979) ............................................................................................ 9

*Norton v. City of Springfield, Ill.*,
  806 F.3d 411 (7th Cir. 2015) .............................................................................. 18

iv

*Occupy Sacramento v. City of Sacramento*,
   878 F. Supp. 2d 1110 (E.D. Cal. 2012) .................................................................. 15

*Patriotic Veterans, Inc. v. Zoeller*,
   845 F.3d 303 (7th Cir. 2017) ........................................................................ passim

*Police Dep't of City of Chi. v. Mosley*,
   408 U.S. 92 (1972) ....................................................................................... 13

*RCP Publications Inc. v. City of Chicago*,
   No. 15-cv-11398, 2016 WL 4593830 (N.D. Ill. Sept. 2, 2016) .............................. 20

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015) ................................................................................ passim

*Reno v. Am. Civil Liberties Union*,
   521 U.S. 844 (1997) ....................................................................................... 28

*Rideout v. Gardner*,
   123 F. Supp. 3d 218 (D.N.H. 2015) ................................................................ 18

*Rowan v. U.S. Post Office Dep't*,
   397 U.S. 728 (1970) ................................................................................. 17, 25

*Ruslan Shipping Corp. v. Coscol Petroleum Corp.*,
   635 F.2d 648 (7th Cir. 1980) ............................................................................ 6

*Satterfield v. Simon & Schuster, Inc.*,
   569 F.3d 946 (9th Cir. 2009) ............................................................................ 4

*Schmitty's City Nightmare, LLC v. City of Fond Du Lac*,
   391 F. Supp. 2d 745 (E.D. Wis. 2005) ............................................................. 22

*Schultz v. City of Cumberland*,
   228 F.3d 831 (7th Cir. 2000) .......................................................................... 22

*Sheriff v. Gillie*,
   136 S. Ct. 1594 (2016) .................................................................................. 16

*Simopoulos v. Virginia*,
   462 U.S. 506 (1983) ...................................................................................... 27

*Sorrell v. IMS Health, Inc.*,
   564 U.S. 552 (2011) ...................................................................................... 13

v

*Strickler v. Bijora, Inc.*,
   No. 11-cv-3468, 2012 WL 5386089 (N.D. Ill. Oct. 30, 2012)................................. 12

*Transport Motor Express, Inc. v. Central States, Se. and Sw. Areas Pension Fund*,
   724 F.2d 575 (7th Cir. 1983)................................................................................. 6

*United States v. Any and All Radio Station Transmission Equip.*,
   207 F.3d 458 (8th Cir. 2000)................................................................................. 10

*United States v. Israel*,
   317 F.3d 768 (7th Cir. 2003)................................................................................. 27

*United States v. Stevens*,
   559 U.S. 460 (2010) ............................................................................................. 22

*Valot v. Se. Local Sch. Dist. Bd. of Educ.*,
   107 F.3d 1220 (6th Cir. 1997).............................................................................. 26

*Van Bergen v. Minnesota*,
   59 F.3d 1541 (8th Cir. 1995)................................................................................. 2

*Virginia v. Hicks*,
   539 U.S. 113 (2003) ............................................................................................. 22

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ................................................................................. 11, 15, 25

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ............................................................................................. 22

*Williams-Yulee v. Florida Bar*,
   135 S. Ct. 1656 (2015) .................................................................................. 23, 26

*Wreyford v. Citizens for Transp. Mobility, Inc.*,
   957 F. Supp. 2d 1378 (N.D. Ga. 2013) ................................................................ 12

## STATUTES

47 U.S.C. § 227 ............................................................................................... passim

47 U.S.C. § 402 ..................................................................................................... 9

28 U.S.C. § 2342 ................................................................................................... 9

Case 2:16-cv-00674-LA    Filed 02/27/17    Page 7 of 39    Document 40

## REGULATIONS

47 C.F.R. § 64.1200 ................................................................................................ 4

## OTHER AUTHORITIES

137 Cong. Rec. H11,310 (daily ed. Nov. 26, 1991) ........................................... 4

137 Cong. Rec. S18784 (daily ed. Nov. 27, 1991) ............................................ 4

H.R. Rep. No. 102-317 (1991) ................................................................... 23, 26

S. Rep. No 102-178 (1991) .................................................................... passim

Bipartisan Budget Act of 2015,
  Pub. L. No. 114-74, 129 Stat. 584 ............................................................ 3

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
  31 FCC Rcd. 9074 (2016) ....................................................................... 16

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*,
  30 FCC Rcd. 7961 (2015) ......................................................................... 6

*In Re: Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
  18 FCC Rcd. 14014 (July 3, 2003) ............................................................ 4

Telephone Consumer Protection Act of 1991,
  Pub. L. No. 102-243, 105 Stat. 2394 .............................................. 23, 24, 27

Case 2:16-cv-00674-LA   Filed 02/27/17   Page 8 of 39   Document 40

## INTRODUCTION

Defendant CBS Radio, Inc. ("CBS"), has raised a facial and as-applied First Amendment challenge to the constitutionality of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"). As relevant here, § 227(b)(1)(A)(iii) of the TCPA prohibits the use of automated dialing systems to make a call or send a text message to a cell phone user without the user's prior express consent, unless the call or message is initiated for an emergency purpose or to collect a debt owed to or guaranteed by the United States. Plaintiff claims that CBS violated the Act by sending her automated text messages, without her consent, containing information about Chicago sports teams. In response, CBS asks this Court to be the first to hold that the TCPA is a content-based regulation of speech that fails strict scrutiny. That challenge is not only contrary to longstanding First Amendment precedent but is in fact contrary to the recent decision of the Seventh Circuit in *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 304 (7th Cir. 2017), in which the court upheld Indiana's anti-robocall statute following the Supreme Court's decision in *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015). Accordingly, CBS's challenge should be rejected.

As a threshold matter, this Court should resolve all nonconstitutional issues before addressing the constitutionality of § 227(b)(1)(A)(iii). CBS has moved to dismiss the Complaint on a variety of nonconstitutional grounds, including standing, mootness, and failure to allege essential components of a TCPA claim. Although the United States takes no position on those issues, their resolution may obviate the need to reach the constitutional question. Accordingly, the Court "should not decide federal constitutional questions where a dispositive nonconstitutional ground is available." *Hagans v. Lavine*, 415 U.S. 528, 547 (1974).

If the court does reach the constitutional challenge, it should be rejected for several reasons. As a preliminary matter, CBS's challenges to the government-debt exception and the FCC's orders

are not properly before this Court; the former has no effect on CBS (or Plaintiff), and Congress has divested federal district courts of jurisdiction over any suit that would result in the invalidation of an FCC order. What is properly before the Court, then, is the language of the TCPA that has been universally affirmed as constitutional by those courts to have considered the question. And the Seventh Circuit has strongly indicated that *Reed* does not undermine that precedent. *See Patriotic Veterans*, 845 F.3d at 306 (noting that "[f]ederal law severely limits unsolicited calls to cell phones, 47 U.S.C. § 227(b)(1)(A)(iii). . . . [and] ha[s] been sustained against constitutional challenge"); *id.* at 304 (citing approvingly, *e.g.*, *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014), and *Van Bergen v. Minnesota*, 59 F.3d 1541 (8th Cir. 1995)). Whether viewed as a content-neutral restriction on speech, or, as in the present case, as a restriction on commercial speech, the TCPA satisfies intermediate scrutiny.

Finally, even if the Court concludes, contrary to the Seventh Circuit's strong indication just last month in *Patriotic Veterans*, that strict scrutiny ought to apply, the narrow statutory provision at issue should be upheld. *See Brickman v. Facebook, Inc.*, No. 16-cv-00751, 2017 WL 386238 (N.D. Cal. Jan. 27, 2017).[1] Congress made extensive findings about the Act's purpose of protecting consumer privacy, an interest the Supreme Court has already acknowledged as substantial. Section 227(b)(1)(A)(iii) is narrowly tailored to protect that interest, prohibiting only the sorts of automated communications that Congress found most problematic – and only in the

---

[1] The *Brickman* court determined that the TCPA is a content-based restriction meriting strict scrutiny because of two exceptions to its broad prohibition, for emergencies and for the collection of government-backed debt; the court nevertheless found that the statute survived strict scrutiny. While the United States agrees with the latter conclusion, it continues to disagree with the former, because those exceptions do not render the TCPA content based. *See infra* Section III.A.

2

absence of consumer consent – and no more.  As such, the TCPA survives even heightened scrutiny.

## BACKGROUND

"Voluminous consumer complaints about abuses of telephone technology — for example, computerized calls dispatched to private homes — prompted Congress to pass the TCPA."  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370-71 (2012).  The ubiquity of cell phones only aggravates such problems.  *See Campbell-Ewald Co.*, 768 F.3d at 876-77.  "People keep their cellular phones on their person at nearly all times: in pockets, purses, and attached to belts.  Unlike other modes of communication, the telephone commands our instant attention."  *Joffe v. Acacia Mortg. Corp.*, 121 P.3d 831, 842 (Ariz. Ct. App. 2005), *cert. denied*, 549 U.S. 1111 (2007) (mem.).  As pertinent here, the statute makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States."  47 U.S.C. § 227(b)(1)(A)(iii).[2]  The TCPA defines an "automatic telephone dialing system" ("autodialer" or "ATDS") as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  *Id.* § 227(a)(1).  The TCPA provides for a private right of action under which persons and entities may obtain injunctive or monetary relief for violations of the Act, including

---

[2] Congress added the final clause of this provision in November 2015 as part of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301, 129 Stat. 584, 588 (2015).

statutory damages of $500 per violation, with a possibility of trebling for knowing or willful conduct. *Id.* § 227(b)(3). The statute applies to both phone calls and text messages. *See In Re: Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 (July 3, 2003); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 949 (9th Cir. 2009); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1009 (N.D. Ill. 2010).

The TCPA exempts calls made "for emergency purposes," 47 U.S.C. § 227(b)(1)(A), (B), which includes any calls "made necessary in any situation affecting the health and safety of consumers." 47 C.F.R. § 64.1200(f)(4); *see also* S. Rep. No. 102-178, at 10 (1991) ("In general, any threat to the health or safety of the persons in a residence should be considered an emergency."). Examples of calls that might be made for emergency purposes include notifications of impending or current power outages, 137 Cong. Rec. H11,310, H11,313 (daily ed. Nov. 26, 1991); 137 Cong. Rec. S18784 (daily ed. Nov. 27, 1991), or of natural disasters or health-related evacuations, 137 Cong. Rec. H11,313. The statute also allows the FCC to exempt calls where doing so would "not adversely affect the privacy rights" that the TCPA seeks to protect. *See* 47 U.S.C. § 227(b)(2)(B)(ii), (b)(2)(C).

The present case is a putative class action against CBS seeking damages for alleged violations of the TCPA. Plaintiff alleges that, although she does not listen to the CBS-owned radio station "670 The Score," does not follow Chicago sports teams, and did not provide her telephone number to the station, CBS has repeatedly sent "unsolicited SMS text messages" to her prepaid "TracFone" cellular telephone. First Amended Complaint ¶¶ 5, 10, ECF No. 5. Plaintiff further alleges that "[a]ll telephone contact by CBS to Bonin on her TracFone cellular telephone occurred via an 'automatic telephone dialing system,'" *id.* ¶ 45, and that such contact was "for non-emergency purposes and in the absence of Bonin's prior express consent." *Id.* ¶ 49. She alleges

4

that she received thirteen such text messages, each of which constitutes a violation of the TCPA warranting treble damages for its "knowing and/or willful" character. *Id.* ¶¶ 54, 28-40; *see id.* ¶ 33 ("On Tuesday, February 9, 2016, Bonin received another text message from CBS. This message referenced an injury to a member of the Chicago Bulls basketball team."); *id.* ¶ 34 ("This message stated that the Chicago White Sox baseball team had signed a player."); *see also* ECF No. 5, Exhs. A-M (photos of text messages). Plaintiff seeks to represent a class of individuals who received non-emergency texts from CBS on or after June 7, 2012, "and who either did not provide their cellular telephone number . . . or who revoked prior express consent to contact the person's cellular phone." First Am. Compl. ¶ 54; *see also* ECF No. 6 (Motion to Certify Class).

CBS has moved to dismiss on various grounds, including the purported unconstitutionality of the TCPA. *See* Def.'s Mot. to Dismiss, ECF No. 16. In its constitutional challenge to the statute, CBS contends that (1) the text messages at issue are non-commercial, newsworthy speech meriting full protection under the First Amendment; (2) the TCPA constitutes a content-based restriction on speech after *Reed* and cannot survive strict scrutiny; and (3) even under a content-neutral analysis, the TCPA cannot survive intermediate scrutiny. *See* Def.'s Mot. 19–28. In addition to its First Amendment challenge, CBS raises a variety of other non-constitutional arguments in favor of dismissal.

On October 28, 2016, CBS filed a notice of the constitutional challenge in its Motion to Dismiss. *See* ECF No. 22. The Court has allowed the United States until February 27, 2017, to intervene to defend the constitutionality of the TCPA. *See* Minute Order of Dec. 16, 2016.

## ARGUMENT

## I.  THE COURT SHOULD RESOLVE ALL NON-CONSTITUTIONAL ARGUMENTS PRIOR TO ADDRESSING THE CONSTITUTIONALITY OF THE TCPA.

As an initial matter, this Court should not address the constitutionality of the TCPA until it resolves all other issues in CBS's Motion to Dismiss. "[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981); *see also Transport Motor Express, Inc. v. Central States, Se. and Sw. Areas Pension Fund*, 724 F.2d 575, 577 (7th Cir. 1983) ("[I]t is improper to proceed to the important constitutional questions in this case without an explicit determination of th[e] potentially dispositive nonconstitutional issue."); *Ruslan Shipping Corp. v. Coscol Petroleum Corp.*, 635 F.2d 648, 650 (7th Cir. 1980) ("The great gravity and delicacy of constitutional decision-making counsels that federal courts abjure constitutional rulings where a 'dispositive nonconstitutional ground is available.'" (quoting *Hagans*, 415 U.S. at 547)).

In addition to its constitutional challenge, CBS raises a variety of other arguments in favor of dismissal. It contends that: (1) Plaintiff has failed to allege a more-than-*de minimis* injury and therefore has no standing to bring her TCPA claim; (2) Plaintiff has failed to allege that an ATDS was used to send her text messages and so has failed to state a claim under the TCPA; (3) this case is moot because Defendant has provided Plaintiff the full relief she seeks; (4) Plaintiff's putative class should not be certified; and (5) the Court should stay the present action pending the D.C. Circuit's opinion in *ACA International v. FCC*, No. 15-1211, a case that will determine the legality of, *inter alia*, provisions of the FCC orders Defendant seeks to challenge here.[3]  *See* Def.'s Mot.

---

[3] In *ACA International v. FCC*, No. 15-1211 (D.C. Cir.) (argued Oct. 19, 2016), the plaintiffs have petitioned for review of four provisions of the FCC's 2015 "Omnibus Order," *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC

6

1–4, 11–19, 28–45.  In order to avoid unnecessary constitutional adjudication, the Court should first address these issues before reaching CBS's First Amendment challenge.[4]

## II.  MANY OF CBS'S ARGUMENTS CONCERN ISSUES THAT SHOULD NOT, AND INDEED CANNOT, BE DECIDED IN THIS CASE.

The Court lacks jurisdiction to consider much of what CBS seeks to place at issue in its Motion to Dismiss.  First, in arguing that the TCPA is content based, CBS relies in large part on the government-debt exception, which Congress added to the statute in 2015.  *See* Def.'s Mot. 21–22.  But that recently added exception, even if found to be invalid, would be severable from the remainder of the statute.  *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 931-32 (1983) ("[T]he invalid portions of a statute are to be severed 'unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not.'" (citation omitted)).  Thus, even if this Court were to agree with CBS that the government-debt exception is unconstitutional, that decision would do nothing to redress CBS's injuries, as that provision is not the basis for Plaintiff's claims against CBS.  Accordingly, CBS lacks standing to challenge the government-debt exception, and the Court should decline to consider CBS's challenge in this case.  *See, e.g.*, *Cache Valley Elec. Co. v. State of Utah Dep't of Transp.*, 149 F.3d 1119, 1123 (10th Cir. 1998) (holding that because the disputed portion of a program was severable from the remainder, plaintiff lacked standing).

---

Rcd. 7961 (2015).  Two of those provisions — the agency's interpretation of the "capacity" of devices to autodial numbers and the treatment of calls to reassigned numbers — may affect CBS's liability in this case; as a result, the resolution of *ACA International* potentially provides additional non-constitutional grounds on which the Court could dismiss this case.  The outcome of *ACA International* will not, however, be dispositive of CBS's constitutional challenge to the statute.

[4] The United States has intervened solely for the purpose of defending the constitutionality of the TCPA and therefore takes no position on the merits of these issues.

The Seventh Circuit recently addressed a similar question in analyzing the constitutionality of Indiana's anti-robocall statute. The Indiana statute broadly prohibited phone messages placed by automated dialing systems in the absence of the recipient's consent. *See Patriotic Veterans*, 845 F.3d at 304. It excepted three types of communications from its reach: (1) messages from school districts to students, parents, and employees; (2) messages to subscribers with business or personal relationships with the caller; and (3) messages advising employees of work schedules. *Id.* Because the plaintiff, a veterans' group, made calls that did not fall under any of those exceptions, the Seventh Circuit held that the group lacked standing to independently challenge the exceptions. *Id.* at 305 ("Potential problems with how [the statutory exemptions in] subsection (a)(3) affects other persons do not give plaintiff standing to complain about [the general prohibition on robo-calls in] subsection (b), its target in this suit.").

Moreover, although CBS cites FCC orders implementing the TCPA as purported examples of content-based restrictions, *see, e.g.*, Def.'s Mot. 21, those orders are not properly before this Court. The orders Defendant points to were issued pursuant to 47 U.S.C. § 227(b)(2)(B)(ii) and § 227(b)(2)(C), which allow the FCC to exempt calls where doing so would "not adversely affect the privacy rights" that the TCPA seeks to protect. Even assuming for the sake of argument that such orders create content-based exemptions that do not withstanding strict scrutiny, it would not follow from such a finding that § 227(b)(1)(A)(iii) – a separate statutory provision that is clearly content neutral – is likewise unconstitutional. Rather, the holding in those circumstances would be limited to finding the orders themselves unconstitutional. Yet unconstitutional agency action cannot call into doubt an otherwise constitutional Act of Congress. [5] To accept Plaintiff's contrary

---

[5] In any event, CBS does not directly challenge the provision of the TCPA that provides the FCC authority to issue orders under the Act, with good reason. *See Brickman v. Facebook, Inc.*, 2017 WL 386238, at *6 (N.D. Cal. Jan. 27, 2017) ("Although the statute empowers the FCC

8

suggestion would be to accept the incorrect proposition that, when an agency issues an order or regulation pursuant to a statute, the agency is in fact amending the statute – something the agency has no power to do. *See, e.g.*, *Dalton v. United States*, 816 F.2d 971, 974 (4th Cir. 1987) (explaining that an agency "lacks power even by a regulation adopted after strict compliance with the Administrative Procedure Act . . . to repeal, modify, or nullify a statute").

Further, this Court lacks jurisdiction to entertain CBS's challenges to the FCC orders themselves. The Communications Act of 1934 establishes the exclusive mechanism for challenging the validity of final orders issued by the FCC. Section 402(a) of that statute specifies that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter . . . shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28 [of the United States Code]." 47 U.S.C. § 402(a). The cross-referenced chapter of the U.S. Code, also known as the Administrative Orders Review Act or the Hobbs Act, provides in relevant part that "[t]he court of appeals (other than the United States Court of Appeals for the Federal Circuit) has *exclusive* jurisdiction to enjoin, set aside, suspend (in whole or in part), *or to determine the validity of* all final orders of the Federal Communications Commission made reviewable by [47 U.S.C. § 402(a)]." 28 U.S.C. § 2342(1) (emphasis added). This "procedural path designed by Congress serves a number of valid goals: It promotes judicial efficiency . . . and allows 'uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress' to enforce the TCPA." *CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 450 (7th Cir. 2010) (citing *New York Tel. Co. v. New York Dep't of Labor*, 440 U.S. 519,

---

to create exceptions that promote the interest of privacy rights, there are content-neutral ways for the FCC to accomplish this . . . . The mere possibility that the FCC could create a content-based exception at some later time does not render this exception to be content-based itself.").

528 (1979)). *See also Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 512 n.4 (E.D. Wis. 2014) (noting that "[t]he Court is bound by all of the FCC's final orders relating to the TCPA" and citing *CE Design, Ltd.*, 606 F.3d at 446, which "hold[s] that under the Hobbs Act, the FCC's TCPA orders are binding" on district courts).

Although CBS's primary purpose may not be to challenge the FCC orders directly, the fact that the validity of those orders forms the basis for its constitutional argument is sufficient to invoke the exclusive jurisdiction of the courts of appeals. *See CE Design*, 606 F.3d at 448 (explaining that "deeming agency action valid or ineffective is precisely the sort of review that the Hobbs Act delegates to the courts of appeals in cases challenging final FCC orders," including cases in which "[t]he effect of th[e] decision is to either strike or validate the regulation interpreting the statute" (internal quotation marks omitted)); *City of Peoria v. Gen. Elec Cablevision Corp.*, 690 F.2d 116, 120 (7th Cir. 1982) (noting that the Hobbs Act's jurisdictional limitations are "equally applicable whether [a party] wants to challenge the rule directly . . . or indirectly"); *see also Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014) ("Hobbs Act jurisdictional analysis looks to the 'practical effect' of a proceeding, not the plaintiff's central purpose for bringing suit." (citation omitted)); *United States v. Any and All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000) ("Whichever way it is done, to ask the district court to decide whether the [FCC] regulations are valid violates the statutory requirements" of the Hobbs Act.).

Thus, it does not matter that CBS does not purport to directly attack the FCC orders themselves. Because the practical result of CBS's arguments regarding the orders would be their invalidation, the district court lacks jurisdiction to consider them.

10

## III.    THE TCPA IS A VALID, CONTENT-NEUTRAL RESTRICTION.

### A.    Courts have long held that the TCPA is consistent with the First Amendment, and nothing in *Reed* compels a different conclusion.

As the Seventh Circuit recently observed in *Patriotic Veterans*, a number of courts have held that the TCPA is a valid time, place, and manner regulation that fully comports with the First Amendment.  *See* 845 F.3d at 304 (collecting cases).  In *Moser v. FCC*, 46 F.3d 970 (9th Cir. 1995), for instance, the Ninth Circuit rejected a First Amendment challenge to the TCPA, holding that the statute is a content-neutral time, place, and manner restriction because it "regulates all automated telemarketing calls without regard to whether they are commercial or noncommercial." *Id.* at 973.  Applying intermediate scrutiny, as directed by Supreme Court precedent, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), the Ninth Circuit held that, in light of the evidence before Congress at the time of its enactment, the statute was a valid response to the "unwarranted intrusion upon privacy" of telemarketers.  *Moser*, 46 F.3d at 972.  The court went on to conclude that the statute was not impermissibly under-inclusive.  *Id.* at 974.

The Ninth Circuit reaffirmed this reasoning in *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014), *aff'd on other grounds*, 136 S. Ct. 663 (Jan. 20, 2016).  The court recognized that *Moser* had rightly treated the TCPA as a content-neutral time, place, and manner restriction, *id.* at 876, and further determined that the Act serves a significant government interest in protecting privacy.  *Id.* at 876–77.  The *Campbell-Ewald* court also found § 227(b)(1)(A)(iii) to be narrowly tailored and to leave open ample alternative channels for the communication of information.  *Id*. Rejecting appellant's contention that "the government's interest only extends to the protection of residential privacy, and that therefore the statute is not narrowly tailored to the extent that it applies to cellular text messages," the court observed that "there [wa]s no evidence that the government's interest in privacy ends at home," but that, "to whatever extent the government's significant

11

interest lies exclusively in residential privacy, the nature of cell phones renders the restriction of unsolicited text messaging all the more necessary to ensure that privacy." *Id.* at 876.

Other circuits have similarly upheld the TCPA against constitutional challenge. *See, e.g.*, *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 376-77 (4th Cir. 2013) ("The district court properly determined that the TCPA is a content-neutral law to which intermediate scrutiny must be applied. . . . . [It] furthers important government interests . . . [and] the TCPA's restrictions do not burden substantially more speech than is necessary to protect those interests."). Moreover, although the Seventh Circuit has not directly addressed the constitutionality of the TCPA, district courts in the circuit have followed the lead of other circuits, rejecting First Amendment challenges to the TCPA. *See, e.g.*, *Strickler v. Bijora, Inc.*, No. 11-cv-3468, 2012 WL 5386089, at *5 (N.D. Ill. Oct. 30, 2012) (upholding TCPA as valid time, place, and manner restriction); *Abbas v. Selling Source, LLC*, No. 09-cv-3413, 2009 WL 4884471, at *7 (N.D. Ill. Dec. 14, 2009) (same); *see also, e.g.*, *Wreyford v. Citizens for Transp. Mobility, Inc.*, 957 F. Supp. 2d 1378, 1380-82 (N.D. Ga. 2013) (upholding TCPA as valid time, place, and manner restriction).

Notwithstanding this unanimity of precedent, CBS argues that, in light of the Supreme Court's decision in *Reed*, the TCPA should be viewed as content based and unconstitutional. Citing the TCPA's exceptions for calls "made solely to collect a debt owed to or guaranteed by the United States," 47 U.S.C. § 227(b)(1)(A)(iii), and calls "made for emergency purposes," *id.* § 227(b)(1)(A), as well as the FCC's orders exempting some calls that do not adversely affect the "privacy rights this section is intended to protect," *id.* § 227(b)(2)(C), CBS argues that the TCPA, like the ordinance in *Reed*, "regulates speech based on content." Def.'s Mot. 21. But *Reed* did not purport to overrule existing precedent or radically alter First Amendment jurisprudence so as to require that result—as the Seventh Circuit specifically recognized in *Patriotic Veterans*. *See* 845

12

F.3d at 306 (holding that decisions upholding the TCPA's constitutionality "have not been called into question by *Reed*").

At issue in *Reed* was a municipal sign ordinance that "identifie[d] various categories of signs based on the type of information they convey[ed], then subject[ed] each category to different restrictions." 135 S. Ct. at 2224. A church wishing to advertise the time and location of its services, *id.* at 2225, challenged a provision of the ordinance aimed at "[t]emporary [d]irectional [s]igns" — a category that included "signs directing the public to a meeting of a nonprofit group," *id.* at 2224. The Supreme Court concluded that the ordinance was content based and could not survive strict scrutiny. *Id.*

The Supreme Court explained that, in view of its precedent, "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227 (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 564-65 (2011); *Carey v. Brown*, 447 U.S. 455, 462 (1980); *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). It noted that a reviewing court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* (quoting *Sorrell*, 564 U.S. at 566). The Court observed that "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* But, either way, "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.*

The Town of Gilbert's sign code was facially content based, the Court reasoned, because whether a particular restriction applied "depend[ed] entirely on the communicative content of the sign." *Id.* Consequently, the government's justifications for the code did not alter the appropriate standard of review. *Id.* The Supreme Court dismissed as immaterial the fact that the municipality

had not sought to silence disfavored messages, *id.* at 2227–28, and emphasized that the viewpoint neutrality of the regulation did not affect the appropriateness of strict scrutiny, *id.* at 2229–30. In its application of strict scrutiny, the Court assumed for the sake of argument that the Town's two proffered interests — preserving aesthetic appeal and promoting traffic safety — were compelling, but it held that the ordinance failed the tailoring inquiry because its distinctions were "hopelessly underinclusive." *Id.* at 2231.

The Court made clear that it was only applying long-settled doctrine, not impliedly overruling generations of First Amendment jurisprudence. *See id.* at 2226–28; *accord Patriotic Veterans*, 845 F.3d at 306. The ruling CBS seeks, however, would fly in the face of that approach. Its expansive interpretation of *Reed* would uproot decades of settled First Amendment case law that *Reed* did not purport to question, and it would unnecessarily threaten important statutes, like the TCPA, that have long been held to be constitutional under the First Amendment. *See Campbell-Ewald*, 768 F.3d 871; *Moser*, 46 F.3d 970. Nothing in *Reed* supports (let alone compels) that result.

First, the lines drawn by the TCPA in no way resemble the lines drawn by the ordinance invalidated in *Reed*. The sign code at issue in *Reed* purported to impose general limits on the display of outdoor signs, but was in fact riddled with twenty-three different exemptions. *Reed*, 135 S. Ct. at 2224. For example, political signs were subject to one rule, while other "ideological" signs were subject to another, both in terms of size and as to when they were allowed, and "Temporary Directional Signs Relating to a Qualifying Event" were subject to still other requirements. *Id.* at 2224–25. Thus, the ordinance in *Reed* was problematic, even under the Court's settled precedents, because it "distinguish[ed] among speech instances that are similarly likely to raise the legitimate concerns to which it responds," which the Supreme Court has taken

14

as a sign that a statute is being put to an "invidious use," *Hill v. Colorado*, 530 U.S. 703, 723–24 (2000). The ordinance aimed to maintain the town's aesthetic appeal and to promote traffic safety, *Reed*, 135 S. Ct. at 2231, but it distinguished between signs (political, ideological, etc.) that seemed equally likely to detract from the town's beauty or add to its traffic, *see, e.g.*, *id.* at 2231–32; *id.* at 2239 (Kagan, J., concurring in the judgment).

The TCPA operates in an entirely different fashion. Congress enacted the TCPA "to protect the privacy interests of residential telephone subscribers." S. Rep. No. 102-178, at 1. As a result, as relevant here, the Act prohibits one narrow category of calls (including text messages) to wireless numbers – *viz.*, those made using an automatic telephone dialing system or an artificial or pre-recorded voice and directed at a cell phone belonging to a recipient who has not previously consented to receive the calls. 47 U.S.C. § 227(b)(1)(B). The statute does not differentiate among calls depending on whether they are ideological, political, or commercial in nature. *Id.* § 227(b)(1)(A)(iii).

That the TCPA exempts emergency calls does not render the statute content based. It is well established that a municipality can prohibit individuals from ringing the doorbells of unconsenting residents (or using sound trucks to convey an amplified message) after a certain hour, even if that ban limits the hours available for First Amendment activity. *See Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 616–17 (1976) ("[T]he Court has consistently recognized a municipality's power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing."); *Ward*, 491 U.S. at 791; *Klein v. City of Laguna Beach*, 533 F. App'x 772, 774 (9th Cir. 2013) (concluding a city's ban on sound amplifications within a certain distance of the local high school for a short period of time following the school day was a valid time, place, and manner regulation); *Occupy Sacramento v. City of Sacramento*, 878 F. Supp. 2d

1110, 1117 (E.D. Cal. 2012) ("Here, § 12.72.090 does not make reference to prohibiting any kind of speech or expression, its prohibition against remaining in the parks after certain hours merely regulates the hours that *anyone* can remain in City parks.").  A law of this sort would not be rendered unconstitutional or even constitutionally suspect simply because "emergency" communications (*i.e.*, sirens or official responses to an emergency at a private residence) were excluded from the statute's reach.  The TCPA's reach is no different.

Similarly, were the recently added exception for calls made to collect government-backed debt properly before the Court, it would not render the statute content based.  First, this exception turns "not on what the caller proposes to say," but instead "on the relation between the caller—the owner or servicer of a government-backed debt, or someone acting on their behalf—"and the recipient,"—the debtor or guarantor responsible for paying that debt.  *Patriotic Veterans*, 845 F.3d at 305.  Because the exception "concern[s] who may be called, not what may be said," it "do[es] not establish content discrimination." *Id.*[6]  Second, the government frequently subjects its own conduct or speech to different requirements than those applicable to private actors, and such provisions have never been thought to raise First Amendment concerns.  *See, e.g.*, *Sheriff v. Gillie*, 136 S. Ct. 1594, 1602 (2016) (discussing governmental immunity under FDCPA); *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672-74 (2016) (discussing governmental immunity under TCPA).  There is no doubt that the TCPA does not apply to the government itself, *see id.* at 672

---

[6] Although the *Brickman* court concluded, without much analysis, that the exception makes no explicit reference to the relationship of the parties, it failed to consider that the statutory phrase "solely to collect a debt," 47 U.S.C. § 227(b)(1)(A)(iii), necessarily implies that relationship; by its very nature, debt collection entails communicating with those who have a legal relationship to the debt.  Indeed, when promulgating implementing rules, the FCC recently clarified that for a call to be made "to collect" a government-backed debt under this provision, the call must "be made to the debtor or another person or entity legally responsible for paying the debt."  *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 31 FCC Rcd. 9074, 9083 ¶ 21 (2016).

16

("The United States and its agencies, it is undisputed, are not subject to the TCPA's prohibitions because no statute lifts their immunity."), and the exemption simply acts to protect those who are collecting debts that the government could undoubtedly collect in the same manner itself without running afoul of the First Amendment.

Second, unlike in *Reed*, which involved speech in the most traditional public fora — the public streets — a court considering the constitutionality of the TCPA must balance an important countervailing factor against First Amendment concerns: the privacy of unwilling listeners. *See, e.g.*, *Hill*, 530 U.S. at 714–16; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 208 (1975); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 320 (1974). In *Hill*, the Court highlighted "the significant difference between state restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication." *Hill*, 530 U.S. at 715–16. It observed that "[t]he recognizable privacy interest in avoiding unwanted communication" is strongest "in the confines of one's own home, or when persons are powerless to avoid it." *Id.* at 716; *see also Rowan v. U.S. Post Office Dep't,* 397 U.S. 728, 736 (1970). In contrast to *Reed*, where countervailing concerns about unwilling listeners inside of the home were not present, *see Carey*, 447 U.S. at 460 ("Streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." (citation and alteration omitted)), the privacy concerns here are significant. The TCPA restricts only calls made and messages sent without consent, *see* 47 U.S.C. § 227(b)(1)(A), and it was enacted to address the same weighty interests that the Court has repeatedly seen fit to balance against a speaker's First

Amendment rights, *see Erznoznik*, 422 U.S. at 208.[7]  It therefore warrants intermediate scrutiny, which, as courts in this and other circuits have long held, it readily satisfies.

If there were any doubt about the impact of *Reed* on the continuing vitality of precedent affirming the constitutionality of the TCPA, that doubt was put to rest by the Seventh Circuit's recent decision in *Patriotic Veterans*.  In that recent case, the Seventh Circuit upheld an Indiana anti-robocall statute against a First Amendment challenge after *Reed* and, in so doing, approvingly cited Ninth and Eighth Circuit opinions rejecting similar challenges to the TCPA before *Reed*.  *See Patriotic Veterans*, 845 F.3d at 304 (holding that Indiana anti-robocall statute is content-neutral and survives intermediate scrutiny, and citing *Moser*, *Campbell-Ewald*, and *Van Bergen*); *id.* at 305–06 ("Preventing automated messages to persons who don't want their peace and quiet disturbed is a valid time, place, and manner restriction.  Other circuits' decisions, which we have cited, spell out the reasoning. . . . *[T]hese decisions have not been called into question by Reed.*" (emphasis added)).  The Seventh Circuit rejected the notion that *Reed* "made these decisions obsolete and [therefore] dooms both state and federal anti-robocall statutes as instances of content

---

[7] Nor do post-*Reed* decisions require a different approach.  To be sure, a smattering of courts has used *Reed* to invalidate or enjoin enforcement of various statutes.  *See, e.g.*, *Cahaly v. Larosa*, 796 F.3d 399, 402 (4th Cir. 2015) (South Carolina's anti-robocall statute, which singled out, among other things, calls "of a political nature"); *Norton v. City of Springfield, Ill.*, 806 F.3d 411 (7th Cir. 2015) (panhandling ordinance barring oral requests for money now but not regulating requests for money later or signs requesting money); *Rideout v. Gardner*, 123 F. Supp. 3d 218 (D.N.H. 2015) (a New Hampshire statute that prohibited photographing marked ballots), *aff'd* 838 F.3d 65 (1st Cir. 2016); *but see Citizens for Free Speech, LLC v. Cty. of Alameda*, 114 F. Supp. 3d 952, 969 (N.D. Cal. 2015) (Breyer, J.) (suggesting *Reed*'s application is limited to ordinances that impose "temporal or geographic restrictions on different categories of . . . signs").  But, for the reasons set forth above, the TCPA context is distinct.  Insofar as the statute at issue in *Cahaly*, for example, might at first glance seem similar to the TCPA, upon inspection the two bear little resemblance to one another.  That statute "prohibit[ed] only those robocalls that [we]re for the purpose of making an unsolicited consumer telephone call or [we]re of a political nature including, but not limited to, calls relating to political campaigns."  796 F.3d at 402.  So it too "raise[d] the specter of impermissible content discrimination," *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 449 (2002), in a manner quite unlike the TCPA.

18

discrimination." *Id.* at 304. Nor did it accept the argument that the three exceptions to the prohibition in the Indiana law necessitated the application of strict scrutiny; instead, the Seventh Circuit noted that exceptions based on "who may be called, not what may be said" do not strip a statute of its content neutrality and, even if one exception were content-based, a party could not challenge that exception unless it was directly affected by it. *Id.* at 305. As the Court explained, "[f]ederal law severely limits unsolicited calls to cell phones, 47 U.S.C. § 227(b)(1)(A)(iii). . . . [and this law] ha[s] been sustained against constitutional challenge." *Id.* at 306. The Supreme Court's decision in *Reed* does not change that analysis.[8]

**B.** **As applied to the speech at issue in this case, the TCPA is a valid restriction on commercial speech.**

The Supreme Court's decision in *Reed* does not aid plaintiff's constitutional challenge in the present case for an additional reason: This case involves commercial speech. "The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980). As the Seventh Circuit has explained, "in commercial-speech cases, the Court applies an intermediate standard of review that accounts for the 'subordinate position' that

---

[8] CBS also contends that even if the Court determines that the TCPA is content-neutral, the statute does not survive intermediate scrutiny. *See* Def.'s Mot. 25. Specifically, it argues that the FCC's recent interpretation of a caller's "capacity" burdens more speech than is permissible and raises constitutional questions under the vagueness doctrine. *Id.* at 26. However, as previously explained, the court lacks jurisdiction to consider that argument, because it collaterally attacks FCC orders. *See supra* Section II. CBS also insists that the TCPA does not survive intermediate scrutiny because it does not leave open sufficient alternative channels of communication. *See* Def.'s Mot. 27. But the Seventh Circuit addressed this precise argument in *Patriotic Veterans*, explaining that even under the Indiana statute, "[e]veryone has plenty of ways to spread messages: TV, newspapers and magazines (including ads), websites, social media (Facebook, Twitter, and the like), calls from live persons, and even recorded spiels if a live operator first secures consent. [Companies] can ask [their consumers] to agree to receive robocalls. Preventing automated messages to persons who don't want their peace and quiet disturbed is a valid time, place, and manner restriction." *Patriotic Veterans*, 845 F.3d at 306. The same is true of the TCPA.

19

commercial speech occupies 'in the scale of First Amendment values.'  In this context, intermediate scrutiny requires 'a fit between the legislature's ends and the means chosen to accomplish those ends . . . that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477-80 (1989)).

       *Reed* does not alter this longstanding rule.  *Reed* concerned signs directing parishioners to the location of a church service, 135 S. Ct. at 2225, and thus the Court had no reason to opine on the protection afforded commercial speech.  *See RCP Publications Inc. v. City of Chicago*, No. 15-cv-11398, 2016 WL 4593830, at *5 (N.D. Ill. Sept. 2, 2016) (concluding, after *Reed* and absent Seventh Circuit precedent indicating otherwise, that "*Central Hudson* and its progeny continue to control the propriety of restrictions on commercial speech"); *accord, e.g.*, *Contest Promotions, LLC v. City & Cnty. of San Francisco*, No. 15-CV-00093-SI, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015); *Chiropractors United for Research & Educ., LLC v. Conway*, No. 3:15-CV-00556-GNS, 2015 WL 5822721, at *5 (W.D. Ky. Oct. 1, 2015).

       The text messages at issue here are properly considered commercial speech.  Although CBS's texts may not resemble some traditional advertisements, they plainly reference the CBS-owned radio station's most prominent product — sports news — and associate that product with their radio station.  CBS insists that the messages here "contained only newsworthy information and no marketing or advertising material," Def.'s Mot. 20, but this assertion assumes a far more circumscribed understanding of commercial speech than is supported by the relevant authority. The Seventh Circuit has stressed that even if an ad does not propose a commercial transaction, it is still properly classified as commercial speech if it is "plainly aimed at fostering goodwill for the

20

. . . brand among the targeted consumer group . . . for the purpose of increasing patronage." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014). Because the text messages here identify, at the outset, that they are sent by a particular radio station — "670 The Score" — their content is associated with that station and helps to build its brand as a reliable source for sports news. *See id.* ("An advertisement is no less 'commercial' because it promotes brand awareness or loyalty rather than explicitly proposing a transaction in a specific product or service.").

The speech here arguably satisfies at least two and possibly all three of the guideposts for classifying speech that contains both commercial and noncommercial elements, *i.e.*, "whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *Jordan*, 743 F.3d at 517. The messages clearly refer to the sports radio station's key product, and they are motivated by a desire to drive listeners to tune in to the station. Economically motivated speech is any communication "designed to advance [the speaker's] business interests," *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1204 n.22 (11th Cir. 1985), as these text messages are here; they disseminate an announcement about a Chicago sports team that is intended to encourage the recipient to listen to "670 The Score" for more news, either at that moment or on another occasion when the recipient is able to tune in. Indeed, even if the messages here served two functions — to inform the recipient about sports news developments and to promote "670 The Score" — so long as the "commercial nature is readily apparent," *Jordan*, 743 F.3d at 519, they are properly characterized as an advertisement. *See also id.* at 517–18 ("If the literal import of the words were all that mattered, this . . . would be noncommercial. But evaluating the text requires consideration of its context, and this truism has special force when applying the commercial-speech doctrine. Modern commercial advertising is enormously varied in form and style."). In sum, the messages at issue here were commercial and

21

intermediate scrutiny would therefore be appropriate despite *Reed*, *see supra* Section III.A; *Moser*, 46 F.3d at 973.[9]

## IV. THE TCPA SATISFIES STRICT SCRUTINY.

If the Court determines that strict scrutiny applies, it should nevertheless reject CBS's constitutional challenge. The statutory provision at issue here is a modest one, aimed at addressing a significant problem about which Congress made ample findings, and the narrow exceptions that allegedly render the TCPA content-based are consistent with its aims. Indeed, a district court in the Northern District of California — the only court to find the statute content based after *Reed* —

---

[9] To the extent that CBS is raising a facial challenge to the statute, that challenge also fails. Under the First Amendment, there are two circumstances in which facial challenges may succeed. A statute is facially unconstitutional if a party can establish either "that no set of circumstances exists under which [the challenged statute] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (citation omitted). As the above analysis shows, CBS cannot prevail under this test because the TCPA is constitutional in its application to commercial speech. In order to prevail, then, CBS must proceed under the second test, which requires CBS to show that the statute is overbroad, such that "a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008). The Supreme Court has emphasized that "the overbreadth doctrine is 'strong medicine' [that should be] employed . . . with hesitation, and then 'only as a last resort.'" *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999) (citations omitted); *accord Schultz v. City of Cumberland*, 228 F.3d 831, 848 (7th Cir. 2000). Of course, this burden is only relevant to the extent that CBS wishes to argue that the TCPA is unconstitutional because of its application to noncommercial speech; if the Court concludes that the TCPA is content neutral, then the statute is clearly constitutional as a facial matter.

Although the TCPA's general prohibition does not distinguish between commercial and noncommercial speech, a great many of its applications are in fact to commercial speech, like the speech at issue here. CBS "bears the burden of demonstrating, 'from the text of [the law] and from actual fact,' that substantial overbreadth exists." *Schmitty's City Nightmare, LLC v. City of Fond Du Lac*, 391 F. Supp. 2d 745, 753 (E.D. Wis. 2005) (quoting *Virginia v. Hicks*, 539 U.S. 113, 121 (2003) (alteration in original)). But aside from claiming that its own speech is not commercial — an assertion that is incorrect, as explained above — CBS makes no attempt to satisfy this burden. Absent such a demonstration, CBS's overbreadth challenge cannot succeed. *See id.*; *see also Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 802-03 (1984) (refusing to entertain overbreadth challenge where plaintiffs "failed to identify any significant difference between their claim that the ordinance is invalid on overbreadth grounds and their claim that it is unconstitutional when applied to [them]").

22

recently held that the statute nevertheless survives strict scrutiny, rejecting many of the same contentions that CBS raises here. *See Brickman*, 2017 WL 386238, at *6–9

Under strict scrutiny, the government bears the burden of showing that the Act furthers a compelling government interest and is narrowly tailored to that interest. *Reed*, 135 S. Ct. at 2231. The Supreme Court recently reaffirmed that strict scrutiny is *not* "strict in theory, but fatal in fact," and that a law regulating speech can be upheld even under this most exacting form of review. *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1666 (2015) (citation omitted) (upholding, under strict scrutiny, state ban on campaign donation solicitation by candidates for judicial office).

Motivated by increasing consumer complaints about telemarketing calls, Congress enacted the TCPA "to protect the privacy interests of residential telephone subscribers." S. Rep. No. 102-178, at 1. The Senate Committee on Commerce, Science, and Transportation, in its report, explained that it "believe[d] that Federal legislation [wa]s necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services." *Id.* at 5. The House Committee on Energy and Commerce likewise concluded that "all too frequently [unsolicited telemarketing] represents more of a nuisance than an aid to commerce." H.R. Rep. No. 102-317, at 18 (1991).

Congress made extensive findings before it legislated and included those findings in the Act. Congress explained that "[t]he use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(1), 105 Stat. 2394, 2394 (1991) (codified at 47 U.S.C § 227 Note). At the time, Congress explained, more than 30,000 businesses actively directed telemarketing to business and residential consumers; more than 300,000 solicitors called over 18 million Americans daily; and total sales generated through

telemarketing in the United States totaled $435 billion in 1990, more than four times the total for 1984. *Id.* § 2(2)-(4). Automated dialing and calling systems, combined with falling long-distance telephone rates, made it inexpensive for companies to engage in these practices. *See* S. Rep. No. 102-178, at 2-4. But, Congress observed, unrestricted telemarketing could "be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety." Pub. L. No. 102-243, § 2(5). Indeed, "[m]any consumers [we]re outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." *Id.* § 2(6). And, although many states "ha[d] statutes restricting various uses of the telephone for marketing . . . telemarketers c[ould] evade their prohibitions through interstate operations," necessitating federal legislation. *Id.* § 2(7).

Congress thus explained that "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices." *Id.* § 2(9). Evidence compiled by Congress "indicate[d] that residential telephone subscribers consider[ed] automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." *Id.* § 2(10). These automated calls were considered to be "more of a nuisance and a greater invasion of privacy than calls placed by 'live' persons." S. Rep. No. 102-178, at 4. Consequently, Congress determined that "[b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." Pub. L. No. 102-243, § 2(12). In keeping with its aim to limit calls that were considered a nuisance or invasion of privacy, Congress further concluded that "the Federal

24

Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution." *Id.* § 2(13).

CBS halfheartedly asserts that "Courts have held that privacy interests such as those the TCPA purports to protect are not compelling," Def.'s Mot. 23 (citing *Gresham v. Rutledge*, No. 4:16-cv-00241, 2016 WL 4027901, at *3 (E.D. Ark. July 27, 2016)), but the recent pronouncements in *Patriot Veterans* suggest the Seventh Circuit would not agree. *See Patriotic Veterans*, 845 F.3d at 305-06 ("No one can deny the legitimacy of the state's goal: Preventing the phone (at home or in one's pocket) from frequently ringing with unwanted calls. Every call uses some of the phone owner's time and mental energy, both of which are precious. Most members of the public want to limit calls, especially cell-phone calls, to family and acquaintances, and to get their political information (not to mention their advertisements) in other ways."). Moreover, the Supreme Court has repeatedly emphasized that the government's profound interest "in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey*, 447 U.S. at 471; *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 775 (1994); *Ward*, 491 U.S. at 796; *Frisby v. Schultz*, 487 U.S. 474, 484–85 (1988) ("[W]e have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom."); *Rowan*, 397 U.S. at 738; *Nat'l Coal. of Prayer, Inc. v. Carter*, 455 F.3d 783, 790 (7th Cir. 2006). These cases recognize that the government's interest in protecting the public's privacy is not merely substantial, but is in fact compelling. *Cf. Cahaly*, 796 F.3d at 405 (assuming government interest in protecting residential privacy and tranquility is compelling). And CBS does not dispute that, if

25

the privacy interests the TCPA seeks to protect are compelling, the statute clearly furthers those interests. *See Patriotic Veterans*, 845 F.3d at 306.

Section 227(b)(1)(A)(iii) is also narrowly tailored. As with other provisions upheld under strict scrutiny, section 227(b)(1)(A)(iii) "restricts a narrow slice of speech." *Williams-Yulee*, 135 S. Ct. at 1670. It restricts only the use of an autodialer or artificial voice to make calls or send text messages to wireless numbers, and only where the recipient has not consented to receive the communication. There is not a single message that a speaker is prohibited from disseminating; instead, only the manner in which a message is communicated is regulated. *Cf. id.* (Florida's "Canon 7C(1) leaves judicial candidates free to discuss any issue with any person at any time."). A message like CBS's sports news announcements could be communicated via announcements on its radio stations, a text sent by other means, or an e-mail. In regulating in this manner, Congress was careful to prohibit only those calls and texts that raise its concern about the added intrusion and annoyance brought about by autodialed calls or texts to wireless numbers, *see* H.R. Rep. No. 102-317, at 5-6, 10; S. Rep. No. 102-178, at 4–5, and no more.

CBS, however, contends that the statute is under-inclusive, because the speech permitted by the exceptions is "just as intrusive as the speech [the statute] prohibits." *See* Def.'s Mot. 23. In fact, the exceptions are narrowly tailored and consistent with the compelling interests motivating the enactment of the statute itself.[10] The emergency exception, for instance, furthers Congress's clear desire to promote privacy and minimize intrusion in a manner that did not

---

[10] Even if it could be properly considered here, the government-debt exception would also withstand strict scrutiny. In providing an exception for entities acting to recover funds guaranteed by the United States, the exception serves the government's compelling interest in protecting the public fisc. *See Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1227 (6th Cir. 1997) ("Protecting the public fisc ranks high among the aims of any legitimate government."). The exception's application only to those attempting to collect on debts owed to or guaranteed by the United States is evidence of its narrow tailoring to further that interest.

26

compromise "the health and safety of the consumer." Pub. L. No. 102-243, § 2(12). It is well established that protecting health and safety is a compelling interest. *See Simopoulos v. Virginia*, 462 U.S. 506, 519 (1983) (recognizing a state's compelling interest in protecting a woman's health and safety); *United States v. Israel*, 317 F.3d 768, 771–72 (7th Cir. 2003) (recognizing the government's compelling interest in "prevent[ing] harm to the public health and safety"). And because the exception is limited only to calls or texts for emergency purposes, it is also narrowly tailored to ensure that Congress's precise aim is carried out. *See, e.g.*, *Brown v. City of Pittsburgh*, 586 F.3d 263, 273-76 (3d Cir. 2009) (finding ordinance exempting emergency workers from ban on congregating within fifteen feet of hospital narrowly tailored).

CBS also contends that the statute is over-inclusive as applied, because the messages here contained information "of public concern and entitled to full First Amendment protection," yet the TCPA provides no exception for newsworthy communications. Def.'s Mot. at 24. But if the statute included an exception for "newsworthy communications," it would actually be *more likely* to violate the First Amendment, through an undeniably content-based provision. Furthermore, CBS's contention misunderstands the nature of the privacy interest at stake. It is not the content of the message that causes it to be intrusive but rather its manner of dissemination — via robocall technology to someone who has not consented to receive such messages. Should a person desire to receive newsworthy information, they are welcome to opt into programs that use robocall technology to disseminate such messages. *Cf. Patriotic Veterans*, 845 F.3d at 306 (noting that "the national government and states such as Indiana have adopted limits on a particular calling technology, the robocall, that many recipients find obnoxious because there's no live person at the other end of the line. The lack of a live person makes the call frustrating for the recipient but cheap for the caller, which multiples the number of these aggravating calls in the absence of legal

27

controls.").  The TCPA, like Indiana's anti-robocall statute, is aimed at "[p]reventing automated messages to persons who don't want their peace and quiet disturbed" while still allowing "plenty of ways to spread messages: TV, newspapers and magazines (including ads), websites, social media (Facebook, Twitter, and the like), calls from live persons, and even recorded spiels if a live operator first secures consent."  *Id.*  The facts of this case demonstrate the TCPA's appropriate sweep:  An avid Chicago sports fan may find updates about the city's teams to be newsworthy, while a person with no interest in sports or Chicago teams would likely find such updates to be a nuisance.  The TCPA allows the former to consent to such messages while protecting the latter from unwanted intrusion.

Finally, CBS asserts that less-restrictive alternatives could achieve the same protection of privacy, citing three such alternatives: time-of-day limitations, mandatory disclosure of the caller's identity, and do-not-call lists.  None of these, however, are viable substitutes for the TCPA's restrictions.  To begin, time-of-day limitations may reduce the span of time in which callers can intrude on individuals' privacy, but leaving open a window for calling necessarily means that the limitation would not be as effective in protecting privacy as the TCPA.  *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997) (explaining that a burden on speech is "unacceptable if less restrictive alternatives would be *at least as effective* in achieving the legitimate purpose that the statute was enacted to serve" (emphasis added)).  Similarly, although mandatory disclosure of the caller's identity may allow an individual to identify the caller or texter, such regulation does not prevent the call or text form intruding on the individual's privacy.  Finally, a do-not-call list would merely transfer the onus from callers who, under the current Act, can avoid TCPA liability by gaining consent, to the recipient, who, under CBS's proposal, would have to affirmatively opt out of receiving calls; in the end, the statute would still reach the same amount of speech, making

28

it no less restrictive. For these reasons, the only court to conclude that the TCPA warrants strict scrutiny concluded that these same three proposed alternatives were not, in fact, less-restrictive substitutes for the TCPA. *See Brickman*, 2017 WL 386238, at *9 ("Time-of-day limitations would not achieve the same privacy objectives because even though such a restriction may designate the span of time in which callers can intrude on an individual's privacy, it would also designate a time for intrusive phone calls. Mandatory disclosure of a caller's identity and disconnection requirements would also not be as effective in achieving residential privacy because these would not prevent the privacy intrusion from the phone call in the first place. Do-not-call lists would also not be a plausible less restrictive alternative because placing the burden on consumers to opt-out of intrusive calls, rather than requiring consumers to opt-in, would obviously not be as effective in achieving residential privacy."); *cf. id.* (explaining that the Fourth Circuit in *Cahaly* and the district court in *Gresham* only found those alternatives to be plausible substitutes because "similar to *Cahaly*, the government in *Gresham* did not contest these three alternatives and therefore failed to demonstrate that no less restrictive alternative was available" (alterations omitted)).

Thus, the TCPA survives strict scrutiny, should the district court here find that standard of review appropriate.

## CONCLUSION

For the foregoing reasons, should the Court reach the question, the United States respectfully urges the Court to conclude that § 227(b)(1)(A)(iii) is constitutional.

Respectfully submitted this 27th day of February, 2017,

CHAD A. READLER
Acting Assistant Attorney General

ERIC R. WOMACK
Assistant Director, Federal Programs Branch

29

*/s/ Anjali Motgi*
ANJALI MOTGI (TX Bar # 24092864)
AIMEE WOODWARD BROWN
BAILEY W. HEAPS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
(202) 305-0879 (office)
(202) 616-8470 (fax)
anjali.motgi@usdoj.gov

*Attorneys for United States of America*

30

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2017, a copy of the foregoing pleading was filed electronically via the Court's ECF system which sent notification of such filing to counsel of record.

 /s/ Anjali Motgi
ANJALI MOTGI
Texas Bar # 24092864
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
(202) 305-0879 (office)
(202) 616-8470 (fax)
anjali.motgi@usdoj.gov